KISTLER, J.
**3 Petitioner pled guilty to four counts of murder and 25 counts of attempted murder, as well as pleading no contest to a twenty-sixth count of attempted murder. As part of a plea bargain, petitioner and the state agreed that he would receive concurrent 25-year sentences for the four murders. They also agreed that each side would be free to argue that the mandatory 90-month sentences for each of the attempted murders should run consecutively or concurrently. After a six-day sentencing hearing, the trial court ordered that 50 months of each 90-month sentence for attempted murder would run concurrently but that 40 months of each of those sentences would run consecutively to each other and to the four concurrent 25-year sentences. As a result of that ruling, petitioner's aggregate sentence totals slightly less than 112 years.
In this post-conviction proceeding, petitioner argues that, because he was a juvenile when he committed his crimes, the Eighth Amendment prohibits the imposition of an aggregate sentence that is the functional equivalent of a life sentence without the possibility of parole. Petitioner's federal argument entails primarily three issues. The first is whether, as a matter of state law, petitioner's Eighth Amendment claim is procedurally barred. See ORS 138.550(2) (barring post-conviction petitioners from raising grounds for relief that were or reasonably could have been raised on direct appeal); Verduzco v. State of Oregon , 357 Or. 553, 355 P.3d 902 (2015) (applying a related statute). If it is, the second issue is whether Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 193 L.Ed. 2d 599 (2016), requires this court to reach petitioner's Eighth Amendment claim despite the existence of that state procedural bar. Third, if petitioner's Eighth Amendment claim is not procedurally barred, the remaining issue is whether and how Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed. 2d 407 (2012), applies when a court imposes an aggregate sentence for multiple crimes committed by a juvenile.
As explained below, we hold that, even if ORS 138.550(2) does not pose a procedural bar to petitioner's Eighth Amendment claim, his claim fails on the merits.
**4 More specifically, the issue in Miller was whether the Eighth Amendment prohibited a juvenile from being sentenced to life imprisonment without the possibility of parole for a single homicide. The Court held that such a sentence could be imposed but only if the trial court found that the crime reflected irreparable corruption rather than the transience of youth. The Court did not consider in Miller whether a juvenile who has been convicted of multiple murders and attempted murders, as in this case, may be sentenced to an aggregate *403 consecutive sentence that is the equivalent of life without the possibility of parole. This case thus poses a different issue from the issue in Miller . Beyond that, we conclude that the facts in this case, coupled with the sentencing court's findings, bring petitioner within the narrow class of juveniles who, as Miller recognized, may be sentenced to life without the possibility of parole.
I. FACTS
On May 20, 1998, when petitioner was 15 years old, he was sent home from high school for bringing a gun to school. Later that day, he shot his father once in the head. Afterwards, he shot his mother five times in the head and once in the heart. He left their bodies in the house but covered each with a sheet. The next morning, petitioner got the morning paper, had a bowl of cereal, and later drove his mother's car to the high school. Petitioner wore a trench coat, under which he concealed three guns: a Ruger .22 pistol with a ten-round clip; a Ruger 10/22 rifle with a banana clip that held 50 rounds; and a Glock 9 mm pistol. The stock of the rifle had been modified to create a pistol grip, which allowed the rifle to be concealed more easily.
As petitioner entered a breezeway at school, he called to one of his friends and told him not to go into the cafeteria that day. He then began walking forward, took the rifle out of his trench coat, pointed it at a classmate's head, and pulled the trigger. When the rifle misfired, he "was like mad and upset." After adjusting the rifle, he "[s]hot [the student] in the back of the head." Petitioner then "turned and started walking south * * * towards the cafeteria" until he came upon another student whom he shot in the face.
**5 After that, he "just walked forward to the cafeteria door and opened up the door and started shooting."
One of the students in the cafeteria thought "it was a joke or something" until he realized that "there was blood coming from [another student]." One student stood up when petitioner began shooting, and petitioner shot her in the head. As another student testified, "it look[ed] lik[e] he aimed at her head." Petitioner began "walking towards the center of the cafeteria and shooting towards the line where people [we]re getting food and snacks." One student dove under a table, and petitioner "walked up and shot that person" in the head. Petitioner then started shooting towards the door "where there's some more kids standing by a table." He put the rifle to a classmate's head and pulled the trigger, but there were no more bullets in the clip. At that point, two students "jump[ed] up and tackle[d]" petitioner. Although petitioner shot one of those students, they were able to subdue petitioner and take his guns.
That day, petitioner killed two students. Two of the students whom he shot in the head survived but were permanently affected. Of the remaining students whom petitioner shot, some nearly died, others were injured in ways that substantially impaired them, while still others recovered physically from their bullet wounds. As a result of petitioner's actions, the state charged him with, among other things, four counts of aggravated murder and 26 counts of attempted aggravated murder. The four counts of aggravated murder were based on killing his parents one day and two students the next day. Twenty four of the 26 counts of attempted aggravated murder were based on the 24 students whom petitioner allegedly shot and wounded but did not kill.[1] One count of attempted aggravated murder was **6 based on the student whom he attempted to kill but did not because the clip ran out of bullets. The final count of attempted aggravated murder arose when, after his arrest, petitioner attempted to kill a police officer with a knife that he had concealed on his person. *404 Before trial, petitioner moved to dismiss the aggravated murder charges, arguing that "[t]he possibility of a sentence of life in prison without the possibility of parole for a fifteen year old convicted of murder constitutes cruel and unusual punishment in violation of * * * the Eighth Amendment to the U.S. Constitution." The arguments that petitioner advanced in the memorandum in support of his motion paralleled the arguments that the United States Supreme Court later found persuasive in Miller ; that is, he argued that the prohibition on sentencing a 15-year old to death should be extended to life without the possibility of parole because of the immaturity of juveniles and their possibility for change. Based on that argument, petitioner asked the sentencing court to declare Oregon's aggravated murder statutes "unconstitutional insofar as these statutes extend the possibility of a true life sentence [a life sentence without the possibility of parole] to a fifteen year old convicted of aggravated murder." The sentencing court denied petitioner's motion to dismiss, and petitioner entered into the plea agreement.
As part of that agreement, petitioner pled guilty to the lesser included offenses of murder and attempted murder. Under Oregon law, his plea meant that petitioner admitted intentionally killing the four people whom he shot and intending to kill the nearly two dozen students whom he shot and wounded and the one student whom he attempted to shoot.[2] Additionally, petitioner stated as part of his plea that, "[b]y permitting the Court to enter a guilty plea on my behalf, I knowingly waive the defenses of mental disease or defect, extreme emotional disturbance, or diminished capacity."[3]
**7 The plea petition recites that petitioner was aware that, as a result of his plea, the trial court was "bound and shall impose a 300 month sentence (25 years) on each [of the four convictions of murder] with those sentences to be served concurrently." Regarding the remaining 26 counts of attempted murder, petitioner acknowledged that he would receive a mandatory sentence of 90 months on each count, that the trial court was not bound to order that the sentences be served concurrently, and that each side was free to argue for consecutive or concurrent sentences.
The sentencing court held a six-day hearing to determine whether the sentences on the 26 attempted murder charges should be concurrent or consecutive. At the hearing, the court considered a presentence investigation report that detailed petitioner's background. It heard an abbreviated recitation of the events that occurred at the high school and also what the officers found when they went to petitioner's home after the shooting. In addition to describing the discovery of his parents' bodies and evidence regarding the manner of their death, the officers described the writings they found in petitioner's room, books they found in his room discussing making explosive devices, and multiple explosive devices secreted throughout petitioner's home.
In mitigation, petitioner submitted evidence from his sister, former teachers, and neighbors who commented on positive aspects of his character. The majority of petitioner's mitigation evidence, however, consisted of expert testimony regarding his mental health. His experts presented evidence that petitioner had been hearing voices for the past three years and that one of the voices had commanded him to commit the murders and attempted murders. Although acknowledging some difficulties in diagnosing adolescents, petitioner's medical experts concluded that he suffered from paranoid schizophrenia or a schizoaffective disorder that combines some of the essential features of schizophrenia and depression.
One of petitioner's experts, Dr. Sack, is a child and adolescent psychiatrist who previously chaired the department of child psychiatry at Oregon Health Sciences University. Sack concluded that, although he could not *405 **8 "pigeonhole [petitioner] into one psychotic box or the other," petitioner's "crimes and his behavior on [May 20 and 21] were directly the product of a psychotic process that had been building intermittently in him over a three-year period."[4] He explained that petitioner's psychosis was treatable, but he cautioned that he could not "claim that it's curable." That is, the psychosis could be managed if petitioner recognized it and accepted treatment, but if petitioner did not treat the psychosis, "he would be a dangerous person." As Sack explained, the "crime [that petitioner committed] is so bizarre, and it so fits with what we know about paranoid schizophrenics, who are dangerous people."
Another of petitioner's experts, Dr. Bolstad, is a psychologist who works extensively with juvenile offenders. He agreed with Sack that petitioner's condition could be treated and that, with continued treatment and supervision, petitioner could be a candidate for release. However, Bolstad also agreed with Sack that petitioner's condition could not be cured. As he testified on cross-examination, "I personally don't think there is any way of curing [petitioner's] disorder. There's not a cure for it, okay? I do think it can be managed," principally with psychotropic medicine. Bolstad then added:
"Real frankly, I would not want to see [petitioner] out on the streets, ever, with this condition, okay? Without medicine and without an awful lot of structure and support services arranged for him."[5]
Petitioner also argued that the trial court should consider his youth when imposing his sentence. More specifically, he incorporated the arguments that he previously had made against imposing a life sentence without possibility of parole for aggravated murder and contended that those same considerations applied equally to imposing consecutive sentences that were equivalent to a life sentence without the possibility of parole. In making that argument, petitioner's **9 counsel advanced virtually the same arguments that later informed the Court's decision in Miller ; that is, he argued that Thompson v. Oklahoma , 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed. 2d 702 (1988), which had categorically prohibited imposing the death penalty on juveniles under 16 years of age, should be extended to aggregate sentences imposed on a juvenile that were equivalent to a life sentence without the possibility of parole.[6]
In addition to those considerations, the court also heard from the surviving students who had been shot, as well as from the students' parents. Each of the students who spoke told the court how petitioner's actions had affected their lives-the loss of their classmates, the loss of the use of their limbs, the loss of part of their childhood, and their difficulty trying to come to terms with that loss. Some parents spoke of losing their children. Others spoke of coming to the school on learning of the shooting, waiting to hear whether their children had been shot, and, if their children had been shot but survived, the difficulty of coping with their children's injuries and trying to move past the harm that petitioner had inflicted on their families.
In determining the appropriate sentence, the trial court began by comparing petitioner's case to the cases of two young homicide offenders[7] who previously had been before the court. One had received a 25-year sentence; the other, a sentence of life with the possibility of parole after 30 years, conditioned on the availability of treatment and other safeguards to ensure that the offender *406 was no longer a danger to society. The court explained that the facts in those cases "pale[d] in the light of the facts" in petitioner's case and concluded that a similar sentence would not be "proportional to those sentences or to these present facts."
The court recognized that petitioners' experts had "necessarily and appropriately focused on [petitioner] and on his condition," and that they "generally agree[d] that with extensive, long-term treatment, they would not expect **10 him to be dangerous to others." The court observed, however, that petitioner's experts had agreed that, "[u]ntreated, or I suppose improperly or incompletely treated, [petitioner] is and remains dangerous." The sentencing court noted that "[o]ne of the last things Dr. Bolstad said was to the effect that there is no cure for [petitioner's] condition, that he should never be released without appropriate medication and-I quote-'an awful lot of structure and appropriate support services arranged for him.' "
After expressing concern that the system might not be able to provide the necessary level of treatment and support, the court observed that, given the mandatory nature of the sentences for attempted murder, it lacked the flexibility to "structure any kind of long-range conditional sentence." The court added, however, that, even if it had that authority, it would not be appropriate to exercise it. The court explained that, after listening to the effect that petitioner's actions had had on his classmates and their families, "[i]t became very apparent yesterday that this sentence needed to account for each of the wounded, who rightly call themselves survivors, and for [petitioner] to know that there was a price to be paid for each person hit by his bullets."
The trial court accordingly divided each mandatory 90-month sentence for attempted murder into two parts. It provided that 40 months of each 90-month sentence would run consecutively to each other and to the four 25-year concurrent sentences for murder, while 50 months of each of those 26 sentences would run concurrently. The sentencing court structured the aggregate sentence to ensure that petitioner would serve 40 months (three-and-one-third years) for each of the students whom he shot with the intent to kill, for the student whom he attempted to shoot in the head but ran out of bullets, and for the officer whom he charged with a knife. As noted, imposing a consecutive 40-month sentence on each of petitioner's 26 attempted murder convictions, when run consecutively to his four concurrent 25-year sentences for murder, results in an aggregate sentence of slightly less than 112 years.
Petitioner challenged his aggregate sentence on direct appeal, contending primarily that it violated **11 Article I, section 16, of the Oregon Constitution. He added in a footnote that his "true-life sentence violates the Eighth Amendment's ban on cruel and unusual punishment, for it is 'grossly disproportionate' to the crime." (Quoting Harmelin v. Michigan , 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed. 2d 836 (1991).) The Court of Appeals rejected petitioner's state constitutional argument, as well as his Eighth Amendment claim. State v. Kinkel , 184 Or. App. 277, 56 P.3d 463, rev. den. , 335 Or. 142, 61 P.3d 938 (2002). A year later, petitioner filed a timely post-conviction petition, challenging his conviction. The post-conviction court denied that petition, the Court of Appeals affirmed, and this court denied review. Kinkel v. Lawhead , 240 Or. App. 403, 246 P.3d 746, rev. den. 350 Or. 408, 256 P.3d 121 (2011).
The United States Supreme Court did not issue its decision in Miller until 2012, approximately a year after petitioner's first post-conviction petition had become final. After the Court decided Miller , petitioner filed a second post-conviction petition, once again raising an Eighth Amendment challenge to his sentence but this time relying on the reasoning in Miller . The post-conviction court ruled that the state post-conviction statutes barred petitioner from raising his Eighth Amendment claim in his second post-conviction petition because he reasonably could have raised that ground for relief in his first post-conviction petition. See ORS 138.550(3) (prohibiting successive petitions if the ground for relief reasonably could have been raised in the preceding petition).
The Court of Appeals affirmed the post-conviction court's judgment, but it did so based on a related procedural statute, *407 ORS 138.550(2). That subsection provides that "no ground for relief may be asserted by [a] petitioner in a petition for review under [Oregon's post-conviction statutes] unless such ground was not asserted and could not reasonably be asserted in the direct appellate review proceeding." ORS 138.550(2) ; see Kinkel v. Persson , 276 Or. App. 427, 443, 367 P.3d 956 (2016) (applying that statutory bar). Although petitioner argued that he could not reasonably have raised his Eighth Amendment claim until after the United States Supreme Court decided Miller , the Court **12 of Appeals explained that petitioner had in fact raised that ground for relief on direct appeal. Id. at 442-44, 367 P.3d 956.
Following this court's decision in Verduzco , the Court of Appeals reasoned that the fact that Miller had not yet been decided when petitioner filed his direct appeal did not mean that the procedural bar in ORS 138.550(2) was inapplicable. Id. It also rejected petitioner's argument that federal law, as a result of the Court's decision in Montgomery , overrode the procedural bar set out in ORS 138.550(2). Kinkel , 276 Or. App. at 438 n. 6, 367 P.3d 956. The Court of Appeals accordingly affirmed the post-conviction court's judgment. We allowed this petition for review to consider whether petitioner's Eighth Amendment claim is procedurally barred in state court and, if not, whether his aggregate sentence violates the Eighth Amendment.
II. ORS 138.550(2)
The state argues that ORS 138.550(2) provides a complete answer to petitioner's Eighth Amendment claim. It contends, and the Court of Appeals agreed, that ORS 138.550(2) precludes petitioner from relitigating in a state post-conviction proceeding the same ground for relief that he litigated on direct appeal.[8] Petitioner responds that the United States Supreme Court decisions interpreting the Eighth Amendment underwent a fundamental shift after he filed his opening brief on direct appeal in 2001. He contends that the Eighth Amendment claim that he is raising now differs from the claim he raised at his sentencing hearing and that his current claim could not reasonably have been raised or adjudicated in 2001. It follows, he concludes, that ORS 138.550(2) does not bar the state courts from reaching the federal claim that he raised in his second post-conviction petition.
We need not resolve the parties' procedural arguments to decide this case. Even if we assume that petitioner **13 is not procedurally barred from relitigating his Eighth Amendment claim on state post-conviction, we conclude that the Court of Appeals decision may be affirmed on an alternative ground. Petitioner's Eighth Amendment challenge to his sentence fails on the merits. Before explaining why we reach that conclusion, we first describe two lines of Eighth Amendment authority. One involves categorical Eighth Amendment limits on juvenile sentencing; the other, the limits that the Eighth Amendment places on a court's ability to impose consecutive sentences for multiple crimes. We then explain why we conclude that, in light of the sentencing court's findings, petitioner's aggregate sentence complies with the Eighth Amendment.
III. EIGHTH AMENDMENT
Eighth Amendment proportionality cases "fall within two general classifications." Graham v. Florida , 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed. 2d 825 (2010). One involves challenges to a term of years in light of all the circumstances of a particular case. Id. at 59-60, 130 S.Ct. 2011 (citing Solem v. Helm , 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed. 2d 637 (1983) ). The other involves categorical limits on certain sentencing practices. Id. at 61, 130 S.Ct. 2011. In this case, petitioner argues that the categorical rule announced in Miller applies to his aggregate sentence. In analyzing petitioner's argument, we accordingly focus on the Court's cases that have announced categorical rules for sentencing juvenile offenders.
*408 A. Categorical sentencing limitations
Generally, in determining whether a categorical rule applies, the Court has looked to "objective indicia of society's standards, as expressed in legislative enactments and state practice," and it also has relied on its own "exercise of independent judgment [regarding proportionality, which entails] consideration of the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question." See Graham , 560 U.S. at 61, 67, 130 S.Ct. 2011 (internal quotation marks and citation omitted). The Court looked to both considerations in concluding that juveniles are not eligible for the death penalty, **14 Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and that juveniles convicted of a nonhomicide offense may not be sentenced to life imprisonment without the possibility of parole, Graham , 560 U.S. at 75, 130 S.Ct. 2011. In contrast to Roper and Graham , the Miller Court relied on a proportionality analysis in holding that not every juvenile who commits a murder is eligible for life imprisonment without the possibility of parole. Miller , 567 U.S. at 479, 132 S.Ct. 2455.[9] Only those juveniles whose homicide reflects irreparable corruption rather than the transience of youth are eligible for a life sentence without possibility of parole. See Montgomery , 136 S.Ct. at 734 (interpreting Miller ).
Following Miller , petitioner relies solely on a proportionality analysis in arguing that the rule from that case applies to his sentence. Because petitioner does not identify any objective indicia of society's standards to support his categorical Eighth Amendment claim, we limit our discussion to the proportionality analyses in Roper , Graham , and Miller . Although those analyses are similar in many respects, they also differ in ways that bear on petitioner's Eighth Amendment argument. Accordingly, we first describe briefly the proportionality analysis in each of those cases before describing a separate line of Eighth Amendment cases regarding aggregate sentences.
In Roper , the Court concluded that the unique characteristics of juveniles made that class of offenders ineligible for the death penalty. The Court observed that
" '[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.' "
Roper , 543 U.S. at 569, 125 S.Ct. 1183 (quoting Johnson v. Texas , 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed. 2d 290 (1993) ). It noted that juveniles, as a class, are more "vulnerable or susceptible to **15 negative influences and outside pressures, including peer pressure." Id. Finally, the Court noted that a juvenile's character and personality traits are "more transitory, less fixed." Id. at 570, 125 S.Ct. 1183. It followed from those considerations that juveniles are not, as a class, as culpable as adults and possess greater capacity for reform, with the result that the penological justifications for the death penalty-retribution and deterrence-apply with less force to juveniles. Id. at 571, 125 S.Ct. 1183. In light of those considerations and the severity of the sentence, the Court concluded that imposing the death penalty on a juvenile was too harsh and too final to comply with the Eighth Amendment.
Graham considered how the constitutional balance is struck when a juvenile is sentenced to life without possibility of parole for a nonhomicide offense. The Court began from the proposition that, although death is different in kind from other punishments, life without the possibility of parole is comparable in terms of severity when applied to a juvenile. Graham , 560 U.S. at 69-70, 130 S.Ct. 2011. Moreover, the Court explained that "defendants who do not kill, intend to kill, or foresee that life will be taken are *409 categorically less deserving of the most serious forms of punishment than are murderers." Id. at 69, 130 S.Ct. 2011. It followed that not only are juveniles generally less culpable than adults who commit the same crime but the nature of the crime (a nonhomicide offense) called for less serious punishment. The Court reasoned that, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. Age and the nature of the crime each bear on the analysis." Id. Given a juvenile's lesser culpability and greater potential for reform, the Court held that the Eighth Amendment categorically bars a sentence of life without possibility of parole for a nonhomicide offense committed by a juvenile.
In Miller , the Court relied on the proportionality reasoning in Roper and Graham to hold that imposing a mandatory life sentence on a juvenile who commits a homicide violates the Eighth Amendment. See 567 U.S. at 470-74, 132 S.Ct. 2455. Specifically, the Court held that a factfinder must be able to make an individualized determination whether a life sentence without possibility of parole is appropriate when **16 a juvenile is convicted of homicide. Id. at 479, 132 S.Ct. 2455. The Court observed that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon," particularly "because of the great difficulty [the Court] noted in Roper and Graham of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' " Id. at 479-80, 132 S.Ct. 2455 (quoting Roper , 543 U.S. at 573, 125 S.Ct. 1183 ). The Court explained, however, that the Eighth Amendment did not foreclose a court from sentencing a juvenile who has committed a homicide to life without the possibility of parole. Id. at 480, 132 S.Ct. 2455.
Later, in Montgomery , the Court concluded that Miller announced a substantive limitation as well as a procedural requirement of an individualized sentencing hearing when a juvenile is convicted of homicide. As the Court explained in Montgomery ,
"Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects ' "unfortunate yet transient immaturity." ' [ Miller , 567 U.S.] at 479 [132 S.Ct. 2455] (quoting Roper , 543 U.S. at 573 [125 S.Ct. 1183] ). Because Miller determined that sentencing a child to life without parole is excessive for all but ' "the rare juvenile offender whose crime reflects irreparable corruption," ' id. at 479-80 [132 S.Ct. 2455] (quoting Roper , 543 U.S., at 573 [125 S.Ct. 1183] ), it rendered life without parole an unconstitutional penalty for 'a class of defendants because of their status'-that is, juvenile offenders whose crimes reflect the transient immaturity of youth. Penry , 492 U.S., at 330, 109 S.Ct. 2934."
136 S.Ct. at 734.[10]
In both Miller and Graham , the severity of the punishment (life without possibility of parole) and the nature of the offender (a juvenile) were the same. Only one factor differed: the nature of the offense. The different categorical rules that the Court announced in those cases resulted from **17 the differing offenses at issue in each case, a nonhomicide in one and a homicide in the other. The Court expressly recognized that point when it explained in Miller that " Graham established one rule (a flat ban [on life without possibility of parole] ) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses." See Miller , 567 U.S. at 474 n. 6, 132 S.Ct. 2455. Similarly, the Court reaffirmed in Miller that a juvenile's "moral culpability [for homicide] and [the] consequential harm" of that offense justified a more severe sanction than a nonhomicide offense. See id. (distinguishing Graham ).
At this juncture in our analysis, one other aspect of the Court's juvenile sentencing cases warrants mention. To date, the Court *410 has not extended its holdings in Roper , Miller , and Graham to lesser minimum sentences. See Graham , 560 U.S. at 124, 130 S.Ct. 2011 (Alito, J., dissenting) ("Nothing in the Court's opinion affects the imposition of a sentence to a term of years without the possibility of parole."); id. at 123, 130 S.Ct. 2011 n. 13 (Thomas, J., dissenting) (making that observation);[11] cf. Miller , 567 U.S. at 475, 132 S.Ct. 2455 (recognizing that Graham 's prohibition on sentencing juveniles to life without possibility of parole for a nonhomicide offense was "unprecedented for a [lesser] term of imprisonment").
Consistently, petitioner does not argue that sentencing him to a 25-year prison term without the possibility of parole for a single murder or 40 months without the possibility of parole for a single attempted murder violates the Eighth Amendment. Rather, his argument rests on the proposition that, even though each sentence for each of his crimes may be constitutionally permissible, running his attempted murder sentences consecutively to each other and to his concurrent murder sentences results in an aggregate sentence that is equivalent to life without the possibility of parole and, as a result, violates the Eighth Amendment. Before turning to petitioner's argument that the reasoning **18 in Miller and Graham applies with equal force to aggregate sentences, we first describe briefly a line of federal authority that touches on aggregate sentencing.
B. Eighth Amendment limits on aggregate sentences
In considering the constitutionality of an aggregate sentence, the United States Supreme Court observed over 125 years ago:
" 'If [a defendant sentenced to an aggregate sentence for multiple offenses] has subjected himself to a severe penalty, it is simply because he has committed a great many such offenses. It would scarcely be competent for a person to assail the constitutionality of the statute prescribing a punishment for burglary on the ground that he had committed so many burglaries that, if punishment for each were inflicted on him, he might be kept in prison for life. The mere fact that cumulative punishments may be imposed for distinct offenses in the same prosecution is not material upon this question. If the penalty were unreasonably severe for a single offense, the constitutional question might be urged; but here the unreasonableness is only in the number of offenses which the [defendant] has committed.' "
O'Neil v. Vermont , 144 U.S. 323, 331, 12 S.Ct. 693, 36 L.Ed. 450 (1892) (quoting State v. O'Neil , 58 Vt. 140, 2 A. 586, 593 (1886) ). To be sure, the passage quoted above was dicta for purposes of the issues facing the United States Supreme Court in O'Neil .[12] However, later courts have found the Court's reasoning persuasive. See, e.g. , Pearson v. Ramos , 237 F.3d 881, 886 (7th Cir. 2001) ("Every disciplinary sanction, like every sentence, must be treated separately, not cumulatively, for purposes of determining whether it is cruel and unusual."); Hawkins v. Hargett , 200 F.3d 1279, 1285 n. 5 (10th Cir. 1999) ("The Eighth Amendment analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence for multiple crimes."); United States v. Aiello , 864 F.2d 257, 265 (2d Cir. 1988) ("Eighth amendment **19 analysis focuses on the sentence imposed for each specific crime, not on the cumulative sentence.").[13] *411 C. Petitioner's arguments
Given those two lines of Eighth Amendment cases, we think that the initial question this case presents is how Miller and Graham apply when a juvenile receives an aggregate life sentence for multiple murders and attempted murders. As we understand petitioner's argument, he contends that the number and nature of his offenses should not be a factor in striking an Eighth Amendment proportionality balance. Rather, he appears to argue that, when a juvenile's aggregate sentence is equivalent to life without possibility of parole, then the severity of the sentence coupled with the characteristics of juvenile offenders will always lead to the conclusion that a life sentence without possibility of parole will violate the Eighth Amendment.
The holdings in Miller and Graham do not compel the categorical rule that petitioner urges. The question in Miller was whether a juvenile who had committed a single homicide could be sentenced to life imprisonment without the possibility of parole for that crime.[14] Graham is **20 similarly limited. In that case, the question was whether a juvenile convicted of a single nonhomicide offense could be sentenced to life without parole. See Graham , 560 U.S. at 48, 63, 130 S.Ct. 2011 ("The instant case concerns only those juvenile offenders sentenced to life without parole solely for a nonhomicide offense.").[15] The Court neither considered nor decided in Miller and Graham how the categorical limitations that it announced for a single sentence for one conviction would apply to an aggregate sentence for multiple convictions.
It follows that the holdings in Miller and Graham do not dictate the result when a juvenile is convicted of multiple murders and attempted murders, as petitioner was. Moreover, the reasoning in those cases leads us to conclude that the inquiry for a sentencing court in imposing an aggregate sentence is not as narrow as petitioner perceives. Contrary to petitioner's argument, Miller and Graham do not limit a sentencing court to considering only the severity of the sentence and the nature of the offender. Rather, those decisions make clear that a sentencing court can and should consider the nature and number of the juvenile offender's convictions.
For example, Graham explained that determining whether a sentencing practice is categorically disproportionate "requires consideration of the culpability of the offenders at issue in light of their crimes and [their personal] characteristics, along with the severity *412 of the punishment in question." 560 U.S. at 67, 130 S.Ct. 2011 (emphasis added). As the Court also stated in Graham , "the age of the offender and the nature of the crime [in that case, a nonhomicide **21 offense] each bear on the analysis." Id. at 69, 130 S.Ct. 2011. As noted above, the one fact that categorically precluded imposition of life without parole on any juvenile offender in Graham but permitted the imposition of that punishment on some juvenile offenders in Miller was the nature of the offense. As the Court explained in Miller , " Graham established one rule (a flat ban) for nonhomicide offenses, while we set out a different one (individualized sentencing) for homicide offenses." 567 U.S. at 474 n. 6, 132 S.Ct. 2455. That was true, even though, as Miller noted, none of what the Court had said about juveniles in Graham and Roper -their "distinctive (and transitory) mental traits and environmental vulnerabilities-is crime-specific." Id. at 473, 132 S.Ct. 2455.
Put simply, "[j]uvenile offenders who commi[t] both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide." Graham , 560 U.S. at 63, 130 S.Ct. 2011.[16] It follows that the reasoning in Graham and Miller permits consideration of the nature and the number of a juvenile's crimes in addition to the length of the sentence that the juvenile received and the general characteristics of juveniles in determining whether a juvenile's aggregate sentence is constitutionally disproportionate.
Given the nature and the number of the crimes that petitioner committed, we are hard pressed to say that his aggregate sentence is constitutionally disproportionate even taking his youth into account. Petitioner killed four people over the course of two days. Additionally, he shot and wounded almost two dozen of his classmates with the intent to kill them. He put a gun to another classmate's head and would have killed him except that the gun ran out of bullets, permitting two students to subdue petitioner before he could shoot anyone else. Finally, even after officers had placed petitioner under arrest, he attempted to kill one of the officers with a knife he had hidden on his person.
**22 We recognize, as petitioner and the state argue, that other courts have divided over whether and how Miller and Graham apply to aggregate sentences for multiple crimes. Some courts take the position that the number and nature of a juvenile's crimes are immaterial when an aggregate sentence approximates life without the possibility of parole.[17] Others find the existence of an aggregate sentence a sufficient basis, in and of itself, for distinguishing Miller and Graham .[18] We strike a middle ground between those two extremes.
*413 We note, as an initial matter, that the nature and number of petitioner's crimes in this case distinguish his aggregate sentence from the aggregate sentences that other courts have found inconsistent with Miller and Graham . See note 17 supra . For instance, this is not a case in which petitioner's aggregate life sentence resulted from a single homicide and a subsidiary related offense, such as committing **23 murder and possessing the weapon used to commit the murder. See McKinley v. Butler , 809 F.3d 908, 911 (7th Cir. 2016) (considering that circumstance). Nor is it a case in which petitioner's aggregate life sentence resulted solely from nonhomicide offenses. See Moore v. Biter , 725 F.3d 1184, 1192 (9th Cir. 2013) (considering that circumstance). Rather, this is a case in which petitioner's aggregate sentence resulted from four murders and 26 attempted murders, all of which were intentional and each of which inflicted substantial, separate harms on multiple victims.
In the same way that a juvenile who commits a single homicide is subject to a greater sentence than a juvenile who commits a single nonhomicide offense, a juvenile who intentionally commits four murders and 26 attempted murders is subject to a greater sentence "based on both [greater] moral culpability and consequential harm" than a juvenile who commits a single homicide. See Miller , 567 U.S. at 473, 132 S.Ct. 2455 (distinguishing a homicide from a nonhomicide); Solem , 463 U.S. at 293-94, 103 S.Ct. 3001 (explaining that the seriousness of the crimes and the offender's mental state bear on the constitutionally permissible sentence). Additionally, the sentencing court's determination that petitioner should serve 40 months for each classmate whom he shot with the intent to kill reflects a legitimate interest in retribution that is proportionate to each attempted murder and results in a correspondingly proportionate aggregate sentence for all petitioner's crimes. Cf. Roper , 543 U.S. at 571, 125 S.Ct. 1183 (explaining that imposing the death penalty on a juvenile whose culpability is reduced by reason of age is so disproportionate for a single murder that it does not reflect a legitimate penological interest).[19]
**24 It might be possible to uphold petitioner's sentence against an Eighth Amendment challenge based solely on the number and magnitude of his crimes. However, we need not go that far to decide this case: The sentencing court's findings in this case persuade us that petitioner comes within the class of juveniles who, as Miller recognized, may be sentenced to life without possibility of parole for a homicide. As noted, Miller explained that, despite the difficulty "of distinguishing at an early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption,' " the Eighth Amendment permits sentencing a juvenile to life without possibility of parole for a single homicide if that crime reflects irreparable corruption *414 rather than the transience of youth. 567 U.S. at 479, 132 S.Ct. 2455 (quoting Roper , 543 U.S. at 573, 125 S.Ct. 1183 ).
The distinction between juveniles whose crime reflects irreparable corruption rather than the transience of youth finds its source in Roper . See Roper , 543 U.S. at 573, 125 S.Ct. 1183 (drawing that distinction). Although Roper announced that distinction without detailing the characteristics that distinguish one class of juvenile offenders from the other, both the discussion that preceded that distinction in Roper and also the Court's decision in Miller shed light on the issue.
As noted above, the Court identified "three general differences" in Roper between juvenile offenders and adults who commit the same offense. Id. at 569, 125 S.Ct. 1183. First, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults." Id. Second, juveniles are "more vulnerable or susceptible to negative influences or outside pressures." Id. Third, "the personality traits of juveniles are more transitory, less fixed" than adults. Id. at 570, 125 S.Ct. 1183. Each of those characteristics results from a juvenile's age and typically will ameliorate as a juvenile grows older. As the Court put it, " '[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside.' " Id. (quoting Johnson , 509 U.S. at 368, 113 S.Ct. 2658 ).
**25 It is precisely because the signature qualities of youth are generally transient that a juvenile's commission of a heinous offense usually does not signal an irretrievably depraved character in the same way that an adult's commission of the same offense does. Id. The Court made that point explicitly in Roper :
"The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of an irretrievably depraved character. From a moral standpoint, it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed."
Id. Put differently, what keeps a juvenile's commission of a heinous offense from reflecting an irretrievably depraved character is the fact that, typically, the characteristics or personality traits that led to the juvenile's commission of the offense are transitory. Conversely, in those rare occasions when those characteristics or traits are fixed, and not transitory, a "heinous crime" can reflect an "irretrievably depraved character" or "irreparable corruption," even when committed by a juvenile.
That conclusion follows from an article that Roper cited in support of the distinction it drew between crimes that reflect the transience of youth and those that reflect irreparable corruption. See id. at 573, 125 S.Ct. 1183 (citing Laurence Steinberg & Elizabeth Scott, Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty , 58 Am. Psychologist, 1009, 1014-16 (2003)). In that article, the authors explain that, because most adolescents do not develop a coherent sense of self until late adolescence or early adulthood, their adolescence can be marked by experimentation that involves "risky, illegal, or dangerous activities like alcohol use, drug use, unsafe sex, and antisocial behavior." Steinberg & Scott, 58 Am. Psychologist at 1014. "For most teens, these behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small portion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into **26 adulthood." Id.[20] The authors conclude *415 that, because most juvenile antisocial behavior does not reflect bad character but instead reflects transient immaturity, juveniles generally should not be subject to the same punishments imposed on adults for the same crimes. Id. at 1015.
The Court's decision in Miller adds one more piece to the puzzle. After observing that the number of juveniles eligible for a life sentence without possibility of parole will be small because of the difficulty of distinguishing between juvenile offenses that reflect the transience of youth and those that reflect irreparable corruption, the Court disagreed with a concern expressed by the dissenting opinions that the Court's holding would preclude "tak[ing] into account the differences among defendants and crimes." Id. at 480 n. 8, 132 S.Ct. 2455. Specifically, the Court made clear that, in deciding whether a juvenile's crime reflects irreparable corruption rather than the transience of youth, sentencing courts can consider that a " '17-year-old [was] convicted of deliberately murdering an innocent victim,' " that a juvenile was convicted of " 'the most heinous murders' " or " 'the worst type of murders,' " or that a " '17-1/2-year-old se[t] off a bomb in a crowded mall.' " Id. (quoting hypotheticals from the dissenting opinions).
As the foregoing discussion makes clear, the transience of youth-the recognition that most juvenile crimes are attributable to traits that will disappear or significantly diminish as a youthful offender ages-is the primary characteristic that justifies a constitutional distinction between the permissible punishment for a juvenile and an adult whose **27 crimes are otherwise identical. As Miller explained and Montgomery confirmed, if a single juvenile homicide reflects the transience of youth, the possibility of reformation is too great for life without possibility of parole to be constitutionally permissible. Montgomery , 136 S.Ct. at 734. However, when the traits that led to the commission of the homicide are fixed or irreparable, rather than transient, then that characteristic no longer bars imposition of a life sentence without possibility of parole for a single homicide. Additionally, the homicide must reflect a level of corruption sufficient to impose life without possibility of parole on a juvenile. See Miller , 567 U.S. at 480 n. 8, 132 S.Ct. 2455 (recognizing that the "most heinous murders" or "the worst type of murders" can evidence irreparable corruption even when committed by a juvenile). For example, a single homicide based on a felony murder theory may not justify a sentence of life without the possibility of parole. See id. at 492, 132 S.Ct. 2455 (Breyer, J., concurring) ("The only juveniles who may constitutionally be sentenced to life without parole are those convicted of homicide offenses who 'kill or intend to kill.' ") (Quoting Graham , 560 U.S. at 69, 130 S.Ct. 2011 )).
With that background in mind, we turn to the trial court's findings in this case. As noted, the trial court held a six-day sentencing hearing at which it considered all the evidence that petitioner presented regarding his youth, his psychological problems, and positive aspects of its character. Although the decisions in Roper , Miller , and Montgomery were not available when the trial court sentenced petitioner, the findings that the trial court made bring petitioner within the class of juveniles who, as Miller recognized, may be sentenced to life without possibility of parole.
The trial court accepted, as petitioner's medical experts had testified, that petitioner suffered from a schizoaffective disorder that motivated him to commit his crimes, and the court agreed that petitioner's disorder was not a function of his youth-i.e. , his condition could be treated but never cured. The sentencing court agreed that, if petitioner's disorder were untreated or inadequately treated, petitioner "remained dangerous." Specifically, the sentencing court agreed with petitioner's expert that "there is no *416 cure for [petitioner's] condition, that he should never be released without appropriate medication and-I quote-'an awful lot **28 of structure and appropriate support services arranged for him.' "[21]
Those findings are inconsistent with a determination that petitioner's crimes "reflect the transient immaturity of youth." Montgomery , 136 S.Ct. at 734 (summarizing why life without possibility of parole is constitutionally impermissible when applied to most juveniles). Rather, as petitioner's experts testified and the sentencing court found, petitioner's crimes reflect a deep-seated psychological problem that will not diminish as petitioner matures.
We also conclude, and we think no person reasonably could dispute, that petitioner's actions are the sort of heinous crimes that, if committed by an adult, would reflect an "irretrievably depraved character," see Roper , 543 U.S. at 570, 125 S.Ct. 1183, or "irreparable corruption," see Miller , 567 U.S. at 480, 132 S.Ct. 2455. And as Miller recognized, the "most heinous murders" or "worst types of murders," even when committed by a juvenile, can evidence irreparable corruption. 567 U.S. at 480 n. 8, 132 S.Ct. 2455 (internal quotation marks and citation omitted). In this case, petitioner admitted and the trial court found that he intentionally shot his parents: his father as he sat unsuspecting at the kitchen counter and his mother as she came home from an errand. Petitioner admitted and the trial court found that he intentionally killed two classmates: one as he was walking in the school hallway and the other as he was trying to find cover from petitioner's bullets in the school cafeteria. And petitioner shot and wounded nearly two dozen innocent students, some only in the ninth grade, intending to kill each and every one of them.[22]
**29 We recognize that the psychological problems that motivated petitioner's crimes are a two-edged sword. On one hand, the trial court's findings establish that petitioner's crimes stem from fixed psychological problems that will not diminish as petitioner ages. On the other hand, those problems diminish his moral culpability in the same way that any and every defendant whose crimes reflect deep-seated psychological problems can claim diminished moral culpability. However, because petitioner's psychological problems diminish his culpability for reasons that are unrelated to his youth, they are independent of and separate from the concerns that animated the Court's Eighth Amendment holdings in Roper , Miller , and Graham . Put differently, while petitioner's psychological problems are relevant mitigating evidence, which the sentencing court considered, they are not the sort of concerns that led to the categorical sentencing limitations announced in Roper , Miller , and Graham .
The dissenting opinion would reach a different conclusion. As we read the dissent, it turns on two propositions. The dissent rests in large part on the proposition that "petitioner's youth is inextricable from his crimes, and it is difficult to comprehend how petitioner's youth at the time of his crimes, in combination with his mental disorder, did not affect the nature and gravity of his crimes." 363 Or. at 34, 417 P.3d at 419 (Egan, J., dissenting). The dissent also reasons that petitioner's psychological problems reduce his culpability for his crimes in a way that makes life imprisonment without possibility of parole unconstitutional as a matter of federal law. 363 Or. at 38, 417 P.3d at 421 (Egan, J., dissenting).
*417 We appreciate the dissent's concerns. However, we question how we can say, as the dissent does, that petitioner's crimes reflect the transience of youth when the trial court reached precisely the opposite conclusion. As noted, the trial court found that "there is no cure for [petitioner's] condition, that he should never be released without appropriate medication and-I quote-'an awful lot of structure and appropriate support services arranged for him.' "[23]
**30 Moreover, given the trial court's finding that the psychological issues that make petitioner dangerous are not transient, we question the other premise on which the dissent rests: the extent to which petitioner's mental health issues bears on the Eighth Amendment analysis in Miller and Montgomery . Unless the Eighth Amendment prohibits imposing a life sentence without the possibility of parole on every criminal defendant (young or old) who commits murder because of psychological issues, we cannot say that it prohibits imposing that sentence on petitioner because he suffers from a psychological problem that will continue throughout his adult years as well as his juvenile ones.[24]
It is important to remember that the issue before us is limited. The question is not how we would find the facts if we were the sentencing court, nor is the question whether the sentence imposed in this case is the one that we would have imposed if we had sentenced petitioner. Rather, the only question before us is whether the sentence that the trial court did impose falls below federal constitutional standards. Given the trial court's findings and the severity of petitioner's acts, we cannot say that petitioner's sentence is constitutionally disproportionate to his crimes for the reasons that underlie the Court's decisions in Miller and Graham . Because we do not agree with petitioner's argument that the holding and reasoning in Miller render his aggregate sentence unconstitutional under the Eighth **31 Amendment, we affirm the Court of Appeals decision and the post-conviction court's judgment.
The decision of the Court of Appeals and the judgment of the circuit court are affirmed.
Egan, J. pro tempore, dissented and filed an opinion.

Those 24 charges alleged that petitioner intentionally had attempted to murder 24 named victims by means of a firearm and included a paired charge that he had intentionally inflicted serious bodily harm on each of the 24 victims. Ultimately, petitioner pleaded guilty only to the attempted murder charges regarding the 24 victims. At the sentencing hearing, there was evidence from either the victims or their parents that petitioner had shot and wounded 21 of the 24 victims. However, there was no evidence that he had shot and wounded three of those 24 victims. It follows that, in discussing the evidence, we say only that petitioner shot and wounded nearly two dozen of his classmates with the intent to kill them.

Petitioner entered a nolo contendere plea regarding the officer whom he charged with a knife. The trial court found petitioner guilty of attempted murder for that act as well.

Later, at the sentencing hearing, petitioner's lawyer explained that petitioner had deliberately waived those defenses but retained the right to raise his mental health issues as mitigation evidence at the sentencing hearing.

Later, Sack testified that petitioner's mental condition "caused him to commit these tragedies" and that petitioner "would not have killed anybody had it not been for the mental illness." Petitioner's other expert, Dr. Bolstad, also testified that the only explanation that he could find for the murders was that petitioner's "behavior was dominated at the time by psychotic thinking, by mental illness."

We quote this portion of Bolstad's testimony because the trial court later adopted it in sentencing petitioner.

In making that argument, petitioner's counsel bridged two gaps. He contended first that Thompson should be extended to (1) a sentence of life without the possibility of parole and (2) equivalent aggregate sentences.

One was a juvenile; the other, just over 18 years old at the time of sentencing.

If the state is correct, it does not follow that petitioner has no remedy. To the contrary, having exhausted his state remedies by raising his Eighth Amendment claim on direct appeal, petitioner can seek to vindicate his federal rights in a federal habeas proceeding. See O'Sullivan v. Boerckel , 526 U.S. 838, 839, 119 S.Ct. 1728, 144 L.Ed. 2d 1 (1999) ("Federal habeas relief is available to state prisoners only after they have exhausted their claims in state court.").

The Court announced its holding in Miller after engaging in a proportionality analysis based on the considerations stated in Roper and Graham . See Miller , 567 U.S. at 479, 132 S.Ct. 2455 (announcing the holding). Consistently, the Court did not conclude that objective indicia of society's standards demonstrated a national consensus against imposing life without parole on juveniles who commit murder. Rather, it explained that those objective indicia did not provide a sufficient basis for departing from the proportionality analysis in Roper and Graham . See id. at 483, 132 S.Ct. 2455.

Having concluded that Miller announced a substantive limitation on sentencing juveniles convicted of homicide, the Court held in Montgomery that that substantive limitation applied retroactively.

Far from disagreeing with the dissenting opinions' observation, the majority explained in Graham that, even though the state could not sentence the defendant in that case to life without possibility of parole for a nonhomicide offense, the defendant still "deserved to be separated from society for some time in order to prevent what the trial court described as an 'escalating pattern of criminal conduct.' " 560 U.S. at 73, 130 S.Ct. 2011.

After noting that O'Neil had not assigned error to the Vermont Supreme Court's ruling that an aggregate life sentence for 306 liquor law convictions did not violate the Cruel and Unusual Clause, the United States Supreme Court repeated with apparent approval the Vermont Supreme Court's reasoning, which is quoted above. O'Neil , 144 U.S. at 331, 12 S.Ct. 693.

See also State v. Hairston , 118 Ohio St. 3d 289, 295, 888 N.E.2d 1073 (2008) ("[P]roportionality review should focus on individual sentences rather than on the cumulative impact of multiple sentences imposed consecutively."); State v. Buchhold , 727 N.W.2d 816, 824 (S.D. 2007) (noting O'Neil and following the courts that have "concluded that the gross disproportionality review applies to the sentence imposed for the individual crimes rather than the consecutive aggregate"); State v. Berger , 212 Ariz. 473, 479, 134 P.3d 378 (2006) ("Thus, if the sentence for a particular offense is not disproportionately long, it does not become so merely because it is consecutive to another sentence for a separate offense or because the consecutive sentences are lengthy in aggregate." (Citing Aiello , 864 F.2d at 265 )); Close v. People , 48 P.3d 528, 539 (Colo. 2002), as modified on denial of reh'g (July 1, 2002) ("The reasoning underlying this statement [from O'Neil ], that a defendant who commits numerous crimes may be punished for each separate crime, supports our conclusion that an abbreviated proportionality review must be completed for each of Close's crime of violence statute sentences."). Other courts reached the same result without considering the dicta in O'Neil . See, e.g. , United States v. Schell , 692 F.2d 672, 675 (10th Cir. 1982) (concluding that the Eighth Amendment applies to individual, rather than aggregate sentences); State v. August , 589 N.W.2d 740, 744 (Iowa 1999) (same).

In Miller , there were two cases before the Court. In one, the 14-year-old defendant was convicted of killing a single victim based on a felony murder theory. 567 U.S. at 465-66, 132 S.Ct. 2455. In the other, there was evidence that the 14-year-old defendant intentionally killed the victim. Id. at 468, 132 S.Ct. 2455. In both cases, state law automatically mandated a life sentence without possibility of parole on conviction for a single homicide.

The defendant in Graham was charged with two offenses: armed burglary with assault or battery, which carried a maximum penalty of life imprisonment without possibility of parole, and attempted armed robbery, which carried a maximum penalty of 15 years' imprisonment. 560 U.S. at 53-54, 130 S.Ct. 2011. Initially, the trial court placed the defendant on probation and withheld adjudication of those charges. Id. at 54, 130 S.Ct. 2011. When the defendant later violated his probation, the court found him guilty of both offenses and sentenced him to life imprisonment on the first offense and 15 years' imprisonment on the second. Id. at 57, 130 S.Ct. 2011. Only the constitutionality of the life sentence for the first offense (armed burglary with assault or battery) was at issue before the Court. Graham did not involve an aggregate sentence for multiple crimes, which was equivalent to a life sentence without the possibility of parole.

Graham made that statement in explaining why statistics addressing sentences for a homicide and a nonhomicide, offered in support of the state's position in that case, were not relevant. Although the context differs somewhat, the statement accurately captures the distinction between the issue in Graham and the issue here.

McKinley v. Butler , 809 F.3d 908, 911 (7th Cir. 2016) (remanding two 50-year consecutive sentences for homicide and possession of the weapon used to commit the homicide where the trial court failed to consider the petitioner's youth); Moore v. Biter , 725 F.3d 1184, 1192 (9th Cir. 2013) (holding that an aggregate life sentence based solely on nonhomicide offenses runs afoul of Graham ); State v. Zuber , 227 N.J. 422, 447, 152 A.3d 197 (2017), cert. den., --- U.S. ----, 138 S.Ct. 152, 199 L.Ed.2d 38 (2017) (remanding for trial court to consider principles stated in Graham in deciding whether aggregate sentences arising out of two rapes should be concurrent or consecutive); Casiano v. Comm'r of Correction , 317 Conn. 52, 73, 115 A.3d 1031 (2015), cert. den. , --- U.S. ----, 136 S.Ct. 1364, 194 L.Ed.2d 376 (2016) (remanding a 50-year aggregate sentence for felony murder and attempted robbery for sentencing in light of Miller ); Henry v. State , 175 So.3d 675, 680 (Fla. 2015) (holding that an aggregate 90-year sentence for sexual battery and robbery violated Graham ); Brown v. State , 10 N.E.3d 1, 8 (Ind. 2014) (applying Miller to sentence defendant to an 80-year aggregate sentence for being an accomplice to two murders and a burglary); People v. Caballero , 55 Cal. 4th 262, 268, 282 P.3d 291, 145 Cal.Rptr.3d 286 (2012) (holding a 110-year aggregate sentence for three nonhomicide offenses inconsistent with Graham ).

Bunch v. Smith , 685 F.3d 546, 551 (6th Cir. 2012) (Graham not clearly applicable to 89-year aggregate sentence for eight distinct felonies); State v. Nathan , 522 S.W.3d 881, 886 (Mo. 2017) (holding that Miller and Graham do not preclude an aggregate sentence equivalent to life without parole for a homicide accompanied by nonhomicide offenses); Lucero v. People , 394 P.3d 1128, 1132-33 (Colo. 2017), cert. den. , --- U.S. ----, 138 S.Ct. 641, 199 L.Ed.2d 544 (2018) (holding that Miller and Graham do not apply to aggregate sentences); State v. Ali , 895 N.W.2d 237, 246 (Minn. 2017), cert. den. , --- U.S. ----, 138 S. Ct. 640, 199 L.Ed.2d 543 (2018) (holding that Miller did not apply to aggregate 90-year minimum sentence for three murders); Vasquez v. Commonwealth , 291 Va. 232, 241-43, 781 S.E.2d 920 (2016) (holding that Graham does not apply to an aggregate life sentence based on multiple convictions for rape and sodomy); State v. Kasic , 228 Ariz. 228, 233, 265 P.3d 410 (Ct. App. 2011) (holding Graham inapplicable to an aggregate life sentence for 32 felonies arising from six arsons and one attempted arson).

Petitioner has not identified any objective indicia of society's standards that demonstrate a national consensus against imposing an aggregate sentence on juvenile offenders who commit multiple murders and attempted murders. The absence of any argument on that point may reflect a recognition that imposing life sentences without parole on juveniles traditionally has been "widely practiced and accepted." See Maureen Dowling, Juvenile Sentencing in Illinois: Addressing the Supreme Court Trend away from Harsh Punishments on Juvenile Offenders ," 35 N. Ill. U. L. Rev. 611, 619 (2015) (recognizing that objective data while arguing for lower sentences). Alternatively, the absence of any argument on that issue may result from the fact that the variety of offenses that can give rise to an aggregate sentence can make any meaningful comparison among aggregate sentences difficult, with the result that aggregate sentences, even for juveniles, evade categorical rules and call instead for a case-specific inquiry.

Steinberg and Scott note that:
"adolescent offenders fall into one of two broad categories: adolescence-limited offenders, whose antisocial behavior begins and ends during adolescence, and a much smaller group of life-course-persistent offenders, whose antisocial behavior begins in childhood and continues through adolescence and into adulthood. According to [a psychological study], the criminal activity of both groups during adolescence is similar, but the underlying causes of their behavior are very different. Life-course-persistent offenders show long-standing patterns of antisocial behavior that appear to be rooted, at least in part, in relatively stable psychological attributes that are present early in development and that are attributable to deficient socialization or neurobiological anomalies. Adolescence-limited offending, in contrast, is the product of forces that are inherent features of adolescence as a developmental period * * *."
58 Am. Psychologist at 1015.

Given the trial court's express findings that petitioner remains dangerous and should not be released without adequate treatment and supervision, we conclude that the court implicitly found, consistent with the evidence before it, that petitioner's psychological issues motivated him to commit the murders and attempted murders and that they would continue to do so without medication and extensive supervision. See Ball v. Gladden , 250 Or. 485, 487, 443 P.2d 621 (1968) (explaining that, as a matter of state law, when a trial court does not make express findings on fact, "we will presume that the facts were decided in a manner consistent with the [trial court's] ultimate conclusion" as long as there is evidence in the record to support those implicit findings).

This case does not require us to decide whether a life sentence without possibility of parole would comply with the Eighth Amendment if petitioner's psychological condition were less entrenched or if it had manifested itself in less devastating ways. We accordingly express no opinion on that issue.

Petitioner's crimes were not a one-time occurrence. During cross-examination, one of petitioner's experts acknowledged that he was aware of a series of violent incidents that had preceded the shootings in this case: when petitioner was six, he broke another child's arm with a piece of rebar after flying into a rage; when petitioner was older, he became upset while looking for a knife and threw a bottle putting a hole in the wall; when he was a freshman in high school, he became angry, got a knife from the kitchen, and threatened his friends, who had locked themselves in a bedroom; and petitioner previously had threatened to kill one of his classmates. Although those incidents did not lead petitioner's expert to reach a different diagnosis, he acknowledged that those incidents had in fact occurred.

We note that, when petitioner entered into his plea bargain, he expressly waived any claim that his psychological problems prevented him from appreciating the consequences of his actions or conforming his conduct to the law. He also expressly gave up any claim that he acted with diminished intent as a result of his psychological problems or that his acts were less culpable because they were the product of an extreme emotional disturbance. His mitigation claim at sentencing thus reduced to the proposition that the psychological problems that motivated his actions were ones that did not affect either the intent with which he committed murder and attempted murder or his ability to control his actions.