Argued and submitted March 7, 2019, at the University of Oregon School of Law, Eugene, Oregon. May 31, 2019
Ryan T. O'Connor, O'Connor Weber LLC, Portland, argued the cause and filed the briefs for petitioner on review.
Paul L. Smith, Deputy Solicitor General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.
Aliza B. Kaplan, Lewis & Clark Law School, Portland, filed the brief for amici curiae Constitutional Law and Criminal Procedure Scholars.
Alexander A. Wheatley, Fisher & Phillips, LLC, Portland filed the brief for amici curiae Lewis & Clark Law School's Criminal Justice Reform Clinic, Oregon Criminal Defense Lawyers Association, Oregon Justice Resource Center, Juvenile Law Center, and Phillips Black, Inc.
**3 In Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), the United States Supreme Court determined that it is cruel and unusual punishment to sentence a juvenile to life without parole unless a court determines that the juvenile's crime does not reflect the " 'transient immaturity' " of youth, but instead, demonstrates that the juvenile is " 'the rare juvenile offender whose crime reflects irreparable corruption.' " Id. at 479-80, 132 S.Ct. 2455 (quoting *599 Roper v. Simmons , 543 U.S. 551, 573, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ). In this post-conviction proceeding, petitioner, a juvenile offender, contends that the 800-month sentence he is serving for a single homicide is the functional equivalent of life without parole and was imposed without a hearing that satisfied the procedural and substantive requirements of the Eighth Amendment. For the reasons that follow, we hold that petitioner is not procedurally barred from seeking post-conviction relief and that his sentence is subject to Miller 's protections. Because this record does not convince us that the sentencing court determined that petitioner's crime reflects irreparable corruption, we reverse the decisions of the Court of Appeals and the post-conviction court and remand to the post-conviction court for further proceedings.
We begin our discussion with the fact that Miller was decided almost 20 years after petitioner and his twin brother, Laycelle, both then 15 years old, murdered an elderly couple. Petitioner was convicted of those murders in 1995, and he appealed to the Court of Appeals. That court affirmed without opinion, and this court denied review. State v. White (Lydell) , 139 Or. App. 136, 911 P.2d 1287, rev. den. , 323 Or. 691, 920 P.2d 550 (1996). In 1997, petitioner filed his first petition for post-conviction relief. The post-conviction court denied relief, and, on appeal, the Court of Appeals affirmed without opinion. This court again denied review. White v. Thompson , 163 Or. App. 416, 991 P.2d 63 (1999), rev. den. , 329 Or. 607, 994 P.2d 132 (2000). Later, petitioner filed a second petition for post-conviction relief, raising a claim under Blakely v. Washington , 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Then, in 2012, the United States Supreme Court decided Miller , and, in 2013, petitioner filed this petition for **4 post-conviction relief.[1] The superintendent responded with a motion for summary judgment, asserting that the petition was procedurally barred; the post-conviction court agreed and dismissed the petition. The Court of Appeals affirmed, and we allowed review. White v. Premo , 285 Or. App. 570, 397 P.3d 504 (2017), rev. allowed , 363 Or. 727, 429 P.3d 385 (2018).
Three procedural barriers to post-conviction relief are relevant here: a statute of limitations, a claim preclusion limitation, and a successive petition limitation. ORS 138.510(3),[2] 138.550(2), (3).[3] The petition before us now is barred by all three of those procedural limitations, unless review is permitted by what we refer to as their "escape" clauses. Each of those escape clauses permit a petitioner to bring a claim that would be procedurally barred if the "grounds" on which the petitioner relies were not asserted **5 and could not reasonably have been either asserted or raised in certain described circumstances. *600 Petitioner argues that because Miller had not yet been decided when he filed his direct appeal and his earlier post-conviction claims, he did not assert and reasonably could not have asserted or raised the "grounds" on which he now relies in those earlier proceedings. The superintendent counters that the term "grounds" refers not to a particular legal argument, but to a general type of claim-here, a claim that a sentence imposes cruel and unusual punishment-and that petitioner asserted that type of claim on direct appeal and in his earlier post-conviction proceeding. Alternatively, the superintendent contends that, even if the term "grounds" contemplates more specificity, petitioner previously asserted a claim that was "close" to a Miller claim or reasonably could have asserted such a claim, and, therefore, his present claim is procedurally barred. As we will explain, two of our recent cases demonstrate that petitioner has the better argument.
In the first case- Verduzco v. State of Oregon , 357 Or. 553, 355 P.3d 902 (2015) -this court considered whether the procedural bar against successive post-conviction petitions barred the petitioner's claim, and, in doing so, focused not on whether the petitioner had asserted the same general type of claim in both petitions, but, rather, on whether the petitioner had relied on the same legal rule to prove both claims of ineffective assistance of counsel. In his successive post-conviction petition, the petitioner relied on his lawyer's failure to give him the advice required by Padilla v. Kentucky , 559 U.S. 356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) : When the immigration consequences of pleading guilty to certain crimes are " 'truly clear,' " defense attorneys must advise their clients that deportation and other adverse immigration consequences will be " 'practically inevitable' " as a result of the plea. Verduzco , 357 Or. at 559, 355 P.3d 902 (quoting Padilla , 559 U.S. at 364, 369, 130 S.Ct. 1473 ). In his original petition, the petitioner did not cite Padilla because the Court had not yet decided that case, but the petitioner had alleged that his lawyer had failed to give him the very advice that the Court later required. Id. at 557-58, 355 P.3d 902. We concluded that the bar against successive petitions **6 precluded the petitioner from relitigating a virtually identical claim. Id. at 573, 355 P.3d 902.
In our most recent post-conviction case, Chavez v. State of Oregon , 364 Or. 654, 438 P.3d 381 (2019), this court followed a path similar to the one it took in Verduzco , but reached a different destination. In Chavez , the petitioner, like the petitioner in Verduzco , filed a petition for post-conviction relief based on Padilla . Id. at 656, 438 P.3d 381. The petitioner's claim was untimely, but he argued that the escape clause applied. Id. at 658-59, 438 P.3d 381. The petitioner argued that Padilla had not been decided until some 12 years after his conviction and that he reasonably could not have raised a Padilla claim in the time permitted by the statute. Id. We agreed and, in doing so, said that the petitioner reasonably could not have anticipated the "ground for relief" on which he later relied-the legal rule adopted in Padilla . Id. at 663, 438 P.3d 381. Thus, Chavez and Verduzco both demonstrate that, as used in the escape clauses in the Post-Conviction Hearings Act, the term "grounds" means the legal rule asserted as a basis for a claim, not the general nature of the claim.[4]
We therefore turn to the superintendent's alternative argument that, even though petitioner did not cite and could not have cited the Miller rule in his previous proceedings, he previously made claims that were "close"
*601 to Miller claims or reasonably could have asserted that legal rule. Consequently, the superintendent contends, the escape clauses do not permit his current claim. Again, Chavez and Verduzco answer the argument advanced.
**7 364 Or. at 661-63, 438 P.3d 381. We explained that, in Verduzco , the petitioner had "litigated a virtually identical Sixth Amendment claim at roughly the same time that Padilla was pursuing his claim"; Chavez , we said, "arises in a different posture." Id. at 662-63, 438 P.3d 381. In Chavez , the petitioner had never asserted a claim that was "virtually identical" to the claim that the Court later decided in Padilla , and we were not persuaded that a Padilla claim reasonably could have been raised within two years of the date that the petitioner's conviction became final-"five years before the petitioners in Verduzco and Padilla raised that claim." Id. at 663, 438 P.3d 381. In reaching that conclusion, we recognized that some litigants had raised Padilla -type claims before Padilla was decided, but we reasoned that the statutory question is not whether a claim conceivably could have been raised but, rather, whether it reasonably could have been raised. Id. The answer to that question, we explained, depends on where the legal rule that forms the basis for a claim lies in a continuum: "[W]hen the underlying principle is 'novel, unprecedented, or surprising,' and not merely an extension of settled or familiar rules, the more likely it becomes that the ground for relief could not reasonably have been asserted." Id.
For the reasons that follow, we conclude that this case arises in the same posture as did Chavez . Like the petitioner in Chavez , petitioner relies on a rule articulated by the Supreme Court many years after petitioner's conviction, and petitioner did not previously litigate a "virtually identical" claim or do so "at roughly the same time" that the Supreme Court was considering that claim. And, we, like the court in Chavez , are not persuaded that petitioner reasonably could have raised a Miller claim within two years of his conviction or his later post-conviction proceedings.
To explain why we reach that conclusion, it is necessary to briefly describe the state of the law before Miller was decided in 2012. See Chavez , 364 Or. at 659-61, 438 P.3d 381 (describing the state of the law before Padilla was decided). In 1988, a plurality of the United States Supreme Court explained in Thompson v. Oklahoma , 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), that "contemporary standards of decency" counsel against executing a person who was under 16 years of age at the time of his or her offense, and **8 the Court thus held that the Eighth Amendment prohibited the practice. Id. at 823, 838, 108 S.Ct. 2687. A year later, in Stanford v. Kentucky , 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the Court also "referred to contemporary standards of decency in this country," but it reached a contrary conclusion with respect to the execution of juvenile offenders over 15 but under 18. Roper , 543 U.S. at 562, 125 S.Ct. 1183. In Stanford , the Court rejected arguments that the death penalty failed to serve the legitimate goals of penology because there was evidence that juveniles possess less developed cognitive skills than adults, are less likely to fear death, and are less mature and responsible, and therefore less morally blameworthy. 492 U.S. at 377-78, 109 S.Ct. 2969. Stanford remained the law until 12 years after petitioner's conviction and eight years after petitioner's first post-conviction petition, when in 2005, the Court decided Roper and held that the Eighth Amendment categorically prohibits states from putting juveniles to death. 543 U.S. at 578-79, 125 S.Ct. 1183.
In Roper , the Court found persuasive certain scientific studies of the characteristics of juvenile offenders and recognized that juveniles typically possess three characteristics that make them different than adults and, consequently, less blameworthy: juveniles often are more impetuous and reckless; they often are more vulnerable to negative influences and peer pressure; and their traits are more transitory and less fixed. Id. at 569-70, 125 S.Ct. 1183. Accordingly, the Court reasoned, the penological justifications for the imposition of the death penalty have less force than they do when applied to adults, *602 and, the Court concluded, a state cannot extinguish a juvenile's life and "potential to attain a mature understanding of his own humanity." Id. at 574, 125 S.Ct. 1183.
The Court again considered the penological justifications for punishing juveniles in Graham v. Florida , 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). The issue in Graham was whether juvenile offenders could be sentenced to life in prison without parole for nonhomicide crimes. Id. at 52, 130 S.Ct. 2011. Retribution, the Court said, "is a legitimate reason to punish," but must be directly related to the personal culpability of the offender and does not justify imposing the most severe penalty short of death on a juvenile nonhomicide **9 offender who is less culpable than an adult offender, for the reasons set out in Roper . Id. at 71-72, 130 S.Ct. 2011. Moreover, the Court explained, the legitimate goal of deterrence is not a sufficient justification for imposing such a sentence on juveniles, because that punishment is rarely imposed and juveniles are less likely than adults to consider consequences before they act. Id. at 72, 130 S.Ct. 2011. Incapacitation for life "improperly denies the juvenile offender a chance to demonstrate growth" and "[t]he penalty forswears altogether the rehabilitative ideal." Id. at 73-74, 130 S.Ct. 2011. Accordingly, the Court adopted a categorical rule giving all juvenile offenders "a chance to demonstrate maturity and reform," prohibiting the imposition of a life without parole sentence on a juvenile offender who did not commit homicide. Id. at 79, 130 S.Ct. 2011.
In Miller , the court considered whether juvenile offenders could be sentenced to life in prison without the possibility of parole for the crime of homicide. The court knit together two strands of precedent. 567 U.S. at 470, 132 S.Ct. 2455. From Roper and Graham , it took the principle that the Constitution categorically bans mismatches between the culpability of a class of offenders-juveniles-and the severity of a penalty. Id. From its death penalty cases, the Court took the principle that the sentencing authority must consider the individual characteristics of the defendant and the details of the offense before imposing that penalty. Id. Likening life without parole for juveniles to the death penalty, the Court then held that "the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violate the Eighth Amendment." Id. What is required, the Court explained, is individualized decision-making and a determination whether the juvenile offender who is being sentenced is typical of those juvenile offenders whose crime " 'reflects unfortunate yet transient immaturity,' " or whether the offender, instead, is " 'the rare juvenile offender whose crime reflects irreparable corruption.' " Id. at 479-80, 132 S.Ct. 2455 (quoting Roper , 543 U.S. at 573, 125 S.Ct. 1183 ). Although the Court did not foreclose a sentencer's ability to make that judgment in homicide cases, it required the sentencer "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Id. at 480, 132 S.Ct. 2455.
**10 Miller did not impose only a procedural rule, however. As the Court later explained in Montgomery v. Louisiana , --- U.S. ----, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016), Miller "did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' " Id. at ----, 136 S.Ct. at 734 (quoting Miller , 567 U.S. at 472, 132 S.Ct. 2455 ). Thus, the Court amplified, "[e]ven if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.' " Id. at ----, 136 S.Ct. at 734 (quoting Miller , 567 U.S. at 479, 132 S.Ct. 2455 ). Miller created a substantive rule that sentencing a child who has committed homicide to life without parole is excessive for all but the "rare" offender whose crime reflects irreparable corruption. Id. at ----, 136 S.Ct. at 734. Thus, Miller made a novel, unprecedented change in the law. "Before Miller , every juvenile convicted of a homicide offense could be sentenced to life without parole. After Miller , it will be the rare juvenile offender who can receive that same sentence." Montgomery , --- U.S. ----, 136 S.Ct. at 734.
*603 Understanding, then, the genesis of Miller , we return to the question of whether petitioner's claim is procedurally barred, either because he previously raised a Miller claim or because he reasonably could have anticipated and raised a Miller claim. On the first point, the superintendent contends that, in his direct appeal, petitioner raised a claim that was so "close" to a Miller claim that it constitutes a procedural bar to this proceeding. The superintendent is correct that, in his direct appeal, petitioner noted his age at the time of his offense as a reason why the court should find his sentence unconstitutional. However, the whole of petitioner's argument was as follows:
"There can be no doubt that the crimes in this case were violent and offensive to society. However, defendant was only 15 at the time the crimes were committed and 17 at the time of sentencing. The philosophy of the juvenile criminal code should be one of rehabilitation and not vindictive justice. The sentence of 800 months imposed upon defendant **11 was excessive, and for the reasons given, constituted cruel and unusual punishment."[5]
As to the superintendent's second point, we are not convinced that petitioner reasonably could have asserted a Miller claim at the time of his direct appeal or his earlier post-conviction proceeding. At those times, the Court had not yet held that juveniles typically possess traits that make them less blameworthy than adults, and certainly had not held that mandatory life-without-parole sentences for juveniles who commit homicide violate the Eighth Amendment. The state may be correct that, in the years preceding Miller , certain offenders were arguing that sentencing authorities must take their youth into consideration, but, under Chavez , the statutory question is not whether a claim conceivably could have been raised, but, rather, whether it reasonably could have been raised. Chavez , 364 Or. at 663, 438 P.3d 381. The rule that the Court articulated in Miller , in 2012, was sufficiently "novel, unprecedented, [and] surprising" that we cannot conclude that petitioner reasonably could have anticipated it within two years of his conviction in 1995 or at the time of his later post-conviction proceeding. See id. (describing Padilla ). We hold that petitioner's claim for post-conviction relief is not procedurally barred, and we turn to its merits.
As noted, petitioner and his brother murdered an elderly couple. Petitioner was convicted of three crimes-aggravated murder of one of the victims, murder of the other victim, and first-degree robbery. On the aggravated murder charge, petitioner was sentenced to life in prison with the possibility of parole; on the murder charge, petitioner was sentenced to a determinate 800-month minimum sentence; and on the first-degree robbery charge, petitioner was sentenced to 36 months, to run consecutively to his sentence **12 for murder. The 800-month sentence-almost 67 years-for the murder of one victim is the only sentence that petitioner challenges as violative of the Eighth Amendment. Petitioner will be 81 years old when he is released on that charge. Petitioner argues that, although that sentence was not explicitly a sentence to life without parole, it is a sentence that exceeds his life expectancy and is the functional equivalent of such a sentence and subject to the protections of Miller .
The superintendent acknowledges that petitioner's sentence for murder is lengthy, but he argues that it does not violate the Constitution for three reasons. First, he argues, because petitioner was sentenced to a term of years and not to life, Miller does not apply. Second, the superintendent argues, even if some determinate sentences may be subject to Miller , petitioner's sentence is not *604 so long as to make it certain that he will die in prison; in fact, the superintendent notes, petitioner is eligible for good-time credit and possibly other forms of relief that could reduce his nearly 67-year sentence to 54 years, permitting his release when he is 68 years old. See OAR 291-097-0215 (setting out rules for credits that reduce time of incarceration). Such a sentence, the superintendent contends, is not a sentence to which Miller applies. Finally, the superintendent argues, the sentencing court did not impose a mandatory sentence; it took petitioner's age into consideration and imposed a sentence that reflects the brutality of petitioner's crime-a crime that demonstrates that petitioner is irreparably corrupt.
The superintendent's first point-that this court should not extend Miller to any term-of-years sentence, no matter how long, finds little support. In Miller , the Court stated that the Eighth Amendment "forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" but then quoted from its decision in Graham : " 'A State is not required to guarantee eventual freedom,' " but it must provide " 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " 567 U.S. at 479, 132 S.Ct. 2455 (quoting Graham , 560 U.S. at 75, 130 S.Ct. 2011 ). Most courts that have considered the matter have understood the inquiry to focus, not on the label attached **13 to a sentence, but on whether its imposition would violate the principles that the Court sought to effectuate.[6] See e.g. , State v. Zuber , 227 N.J. 422, 446-47, 152 A.3d 197, 211-12, cert. den. , --- U.S. ----, 138 S.Ct. 152, 199 L.Ed.2d 38 (2017) ( Miller 's principles "appl[y] with equal strength to a sentence that is the practical equivalent of life without parole"); State v. Ramos , 187 Wash.2d 420, 438-39, 387 P.3d 650, 660, cert. den. , --- U.S. ----, 138 S.Ct. 467, 199 L.Ed.2d 355 (2017) (rejecting "notion that Miller applies only to literal, not de facto, life-without-parole sentences" because holding otherwise would contravene Miller 's core holding); People v. Caballero , 55 Cal.4th 262, 267-68, 282 P.3d 291, 294-95, 145 Cal.Rptr.3d 286 (2012) (applying Graham to 110 -year-to-life sentence for nonhomicide offenses); Casiano v. Comm'r of Corr. , 317 Conn. 52, 72-74, 115 A.3d 1031, 1043-45 (2015), cert. den. , --- U.S. ----, 136 S.Ct. 1364, 194 L.Ed.2d 376 (2016) ("[M]ost courts that have considered the issue agree that a lengthy term of years for a juvenile offender will become a de facto life sentence at some point[.]"); Henry v. State , 175 So.3d 675, 680 (Fla. 2015) (applying Graham to nonhomicide offender's aggregate sentence); Brown v. State , 10 N.E.3d 1, 8 (Ind. 2014) (applying Miller to juvenile offender's aggregate sentence of 150 years for murder and robbery); State v. Null , 836 N.W.2d 41, 71 (Iowa 2013) (determining that Miller applies to a "lengthy term-of-years sentence"); Bear Cloud v. State , 334 P.3d 132, 144 (Wyo. 2014) (holding that Miller applies to aggregate sentences that "result in the functional equivalent of life without parole"); see also Moore v. Biter , 725 F.3d 1184, 1191-92 (9th Cir. 2013) (determining that Graham 's focus "was not on the label of a 'life sentence'-but rather on the difference between life in prison with, or without, possibility of parole"). As the Court explained in Montgomery , Miller "did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of 'the distinctive attributes of youth.' " --- U.S. ----, 136 S.Ct. at 734 (quoting Miller , 567 U.S. at 472, 132 S.Ct. 2455 ). The superintendent does not cite any additional penological justifications for a sentence that is the functional equivalent of life, and we see no reason to treat such a sentence differently. **14 Whether petitioner's sentence is, in fact, functionally equivalent to a life sentence is the next question we must answer. Here, as noted, petitioner's 800-month sentence would result in his release at age 81, and he argues that that is a de facto life sentence because his life expectancy is only 75-76 years. In making that argument, petitioner relies on the life expectancy of black males-a statistic from the Center for Disease Control-and the superintendent does not take issue with that measure. Instead, the superintendent *605 cites regulations that demonstrate that petitioner may be released after serving 54 years of his sentence, at age 68, potentially giving him 7-8 years of life outside of prison.
Courts that have grappled with the issue of how lengthy a sentence must be to trigger the protections of Miller often reference Graham 's instruction that juvenile offenders must retain a meaningful opportunity for release. See Null , 836 N.W.2d at 71-72 (explaining that it does "not regard the juvenile's potential future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of Graham or Miller "); Casiano , 317 Conn. at 74-75, 115 A.3d at 1044-45 (noting that most courts that have considered the issue have determined that a sentence that exceeds life expectancy or that would make the individual eligible for release near the end of her life expectancy is a de facto life sentence). In this case, the superintendent does not raise an objection to use of life expectancy tables to analyze that question, nor does he contest the particular table on which petitioner relies. However, other courts have pointed to "a tangle of legal and empirical difficulties" that arise in such an analysis. People v. Contreras , 4 Cal.5th 349, 361, 229 Cal.Rptr.3d 249, 411 P.3d 445, 449 (2018) ; see United States v. Grant , 887 F.3d 131, 149, reh'g granted , 905 F.3d 285 (3rd Cir. 2018) (discussing difficulties). Whether gender, race, or a juvenile's particular medical condition should be taken into consideration and, if so, how and when, are significant questions. So, too, is the question of how the opportunity to earn early release may factor into such a decision.[7]
**15 We decline, however, to take up those questions here. First, the parties' briefing on those issues is scanty. The superintendent does no more than to state, summarily, and without case citation, that, with good-time credit, petitioner's sentence is not a sentence that offers "no hope or incentive for reformation." Second, even allowing for good-time credit, petitioner will serve at least 54 years and will be released, at the earliest, when he is 68 years old. We know of no state high court that has held that a sentence in excess of 50 years for a single homicide provides a juvenile with a meaningful opportunity for release. See Contreras , 4 Cal.5th at 369, 411 P.3d at 455 (citing cases and so noting).[8] Given those particular circumstances, we conclude that petitioner's sentence is sufficiently lengthy that a Miller analysis is required. We do not mean to foreclose a future argument that a sentence in excess of 50 years would leave a particular juvenile offender with a meaningful opportunity for release. But in this case, that argument has not been developed. Accordingly, we turn to the superintendent's better-developed argument that petitioner's 800-month sentence was not mandatory, that the sentencing court in fact provided petitioner with the individualized sentencing process that Miller requires,[9] and that the sentence it imposed was not excessive under Miller .
The superintendent is factually correct in his observation that the 800-month *606 sentence that the sentencing **16 court imposed was not a mandatory sentence and that the court took petitioner's individual characteristics into consideration in imposing it. But, as noted, Miller did more than require that a trial court engage in individualized sentencing; it prohibited a trial court from irrevocably sentencing a juvenile to life in prison without determining that the juvenile is one of the "rare" offenders "whose crimes reflect irreparable corruption." Montgomery , --- U.S. ----, 136 S.Ct. at 734.[10]
As to that substantive limitation, the superintendent contends that, although the sentencing court did not use that precise phrasing, its rationale in sentencing petitioner, as well as its findings, are consistent with a determination that petitioner's criminal conduct resulted not from the transience of youth, but from his irreparable corruption. The superintendent argues that, as in Kinkel v. Persson , 363 Or. 1, 417 P.3d 401 (2018), the sentencing court in this case took petitioner's age and mental condition into consideration and nevertheless imposed a lengthy sentence. The court found that petitioner's crime was premeditated and particularly brutal, and society, the court said, could not "afford to take a chance" on petitioner "ever again."
Before we discuss our decision in Kinkel , we think it important to note two aspects of the Supreme Court's ruling in Miller (as discussed in Montgomery ) that bear on our analysis. First, the fact that the trial court considered a juvenile's age in sentencing the juvenile does not mean that the sentence comports with Miller 's requirements. Montgomery , --- U.S. ----, 136 S.Ct. at 734 ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects 'unfortunate yet transient immaturity.' " (Quoting Miller , 567 U.S. at 479-80, 132 S.Ct. 2455.)). Second, **17 the Court has instructed that only the "rare" juvenile who commits a homicide may be sentenced to life without parole. Id. As a general rule, when appellate courts find Miller applicable, they send challenges to the sentences imposed back to the sentencing court for reconsideration in light Miller . See id. at ----, 136 S.Ct. at 736-37 (remanding for petitioner to have opportunity to show his crime did not reflect irreparable corruption); Null , 836 N.W.2d at 76 (remanding to trial court to apply principles of Miller ); People v. Araujo , 2013 WL 840995, at *5 (Cal. Ct. App. Mar. 7, 2013) (same); State v. Simmons , 99 So.3d 28 (La. 2012) (per curiam) (same); Bear Cloud , 334 P.3d at 147 (same); see also Adams v. Alabama , --- U.S. ----, 136 S.Ct. 1796, 1796-97, 195 L.Ed.2d 251 (2016) (vacating the petitioner's sentence and remanding to state appellate court for further consideration in light of Montgomery ).
As we will explain, Kinkel is an exception to that rule. As a preliminary matter, it is important to remember that, in Kinkel , there was a significant question about whether Miller applied at all to an aggregate sentence such as the sentence imposed in that case-approximately 112 years for four murders and 26 attempted murders. In affirming that sentence, this court determined that "the reasoning in Graham and Miller permits consideration of the nature and the number of a juvenile's crimes in addition to the length of the sentence that the juvenile received and the general characteristics of juveniles in determining whether a juvenile's aggregate sentence is constitutionally disproportionate." 363 Or. at 21, 417 P.3d 401. We indicated that a juvenile who intentionally commits four murders and 26 attempted murders may be subject to a greater sentence than a juvenile who commits a single homicide and that the sentencing court's determination that petitioner should serve 40 months for each classmate whom he shot *607 with the intent to kill "reflects a legitimate interest in retribution that is proportionate to each attempted murder and results in a correspondingly proportionate aggregate sentence for all [the] petitioner's crimes." Id. at 23, 417 P.3d 401. We observed that it might be possible to uphold the petitioner's sentence based solely on the number and magnitude of his crimes; but, given the strength of the other evidence in the record, we demurred. Id. at 24, 417 P.3d 401. Instead, we upheld the petitioner's sentence **18 because the record demonstrated that the petitioner is one of " 'the rare juvenile offender[s] whose crime reflects irreparable corruption,' " rather than "the transience of youth." Id. (quoting Miller , 567 U.S. at 479, 132 S.Ct. 2455 ).
In reaching that conclusion, we relied on the fact that the sentencing court had held a six-day hearing at which it had considered evidence that the petitioner provided regarding his youth, his psychological profile, and his character. Id. at 27, 417 P.3d 401. We also relied on that court's specific findings that petitioner suffered from a mental disorder, confirmed by multiple mental health experts, that motivated him to commit his crimes and that his crimes reflected "a deep-seated psychological problem that will not diminish as [the] petitioner matures." Id. at 28, 417 P.3d 401. Those crimes, we concluded, were not only heinous, but no reasonable person could dispute that they reflected, not the transient immaturity of youth, but an " 'irretrievably depraved character.' " Id. (quoting Roper , 543 U.S. at 570, 125 S.Ct. 1183 ). The petitioner killed his father while he sat at the kitchen counter; killed his mother once she returned home from running an errand; and, the next day, went to his school and began shooting. He killed two classmates and intended to kill over two dozen more. Id.
This case is different. Petitioner received a de facto life sentence for one murder as opposed to an aggregate life sentence for many more, and we cannot conclude that the trial court's decision reflects a determination that petitioner is one of the rare juvenile offenders whose crimes demonstrate irreparable corruption.
To be sure, the trial court found that the crimes that petitioner committed were heinous. Petitioner planned for over a week to steal a car and obtained a weapon and wore gloves to do so. Petitioner was aware that he might murder someone in the process and sought out victims who would be unable to fight back-a couple in their 80s with significant health problems. When petitioner and his brother broke into their home, they brutally beat both victims, striking them with their fists and weapons. The trial court described that brutality in detail:
It does not appear, however, that the sentencing court in this case "[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." Miller , 567 U.S. at 480, 132 S.Ct. 2455. The sentencing court recognized that petitioner lacked internal controls, but it expressed an inability to determine the cause of that inability. The court said,
The court did not make a finding, as the sentencing court did in Kinkel , that petitioner's crime was motivated by an incurable psychological condition, but, instead, expressed its hope that petitioner would be rehabilitated. That rehabilitation, the court said, should occur "inside the walls [of prison] rather than outside the walls." This record does not convince us that the sentencing court reached the conclusion that petitioner is one of the rare juvenile offenders who is irreparably depraved or that no reasonable trial court could reach any other conclusion. Accordingly, we reverse the judgments of the lower courts barring petitioner's claim **20 for post-conviction relief and remand to the post-conviction court for further proceedings.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.
Duncan and Garrett, JJ., did not participate in the consideration or decision of this case.
ORS 138.510(3) provides:
"(3) A petition pursuant to [the Post-Conviction Hearing Act (PCHA) ] must be filed within two years of the following, unless the court on hearing a subsequent petition finds grounds for relief asserted which could not reasonably have been raised in the original or amended petition:
"(a) If no appeal is taken, the date the judgment or order on the conviction was entered in the register.
"(b) If an appeal is taken, the date the appeal is final in the Oregon appellate courts.
"(c) If a petition for certiorari to the United States Supreme Court is filed, the later of:
"(A) The date of denial of certiorari, if the petition is denied; or
"(B) The date of entry of a final state court judgment following remand from the United States Supreme Court."
ORS 138.550 provides in relevant part:
"(2) When the petitioner sought and obtained direct appellate review of the conviction and sentence of the petitioner, no ground for relief may be asserted by petitioner in a petition for relief under [the PCHA] unless such ground was not asserted and could not reasonably have been asserted in the direct appellate review proceeding. ***
"(3) All grounds for relief claimed by petitioner in a petition pursuant to [the PCHA] must be asserted in the original or amended petition, and any grounds not so asserted are deemed waived unless the court on hearing a subsequent petition finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition. However, any prior petition or amended petition which was withdrawn prior to the entry of judgment by leave of the court, as provided in ORS 138.610, shall have no effect on petitioner's right to bring a subsequent petition."
The superintendent's argument that our decision in Datt v. Hill , 347 Or. 672, 678, 227 P.3d 714 (2010), compels a contrary result is not persuasive. In Datt , this court considered the meaning of the term "grounds" and the phrase "grounds for relief" in other statutes included in the PCHA-ORS 138.530, which identifies the available "grounds" for post-conviction relief, and ORS 138.550, which describes the necessary components of a petitioner's claim. Id. at 677-79, 227 P.3d 714. We said that the legislature apparently used the term "grounds " in ORS 138.530(1) to refer to the types of claims a petitioner may assert, but that the legislature may have used that word or the phrase "grounds for relief" differently in ORS 138.550. Id. at 678-79, 227 P.3d 714. In Datt , we did not consider how the legislature used the word "grounds" in the escape clauses that are at issue here, and Verduzco and Chavez provide the relevant authority on that point.
The superintendent does not cite any contrary authority.
As petitioner notes, the Department of Corrections may or may not grant petitioner credits to reduce his sentence, and it may revoke the credits it awards. See OAR 291-097-0215(4) (permitting credit for compliance with case plan and appropriate institution conduct); OAR 291-097-0250 (bases for retracting credits); see also Pepper v. United States , 562 U.S. 476, 501 n. 14, 131 S.Ct. 1229, 179 L.Ed.2d 196 (2011) (noting that, under federal law, an award of good-time credit "does not affect the length of a court-imposed sentence" and is rather an "administrative reward" to provide incentive for compliance with institutional regulations); Bear Cloud , 334 P.3d at 136 n. 3 (declining to rely on good-time credit in analysis for whether sentence is de facto life sentence without parole).
The superintendent does not cite such a case.
The transcript of the sentencing hearing was not before the post-conviction court. Petitioner asks this court to take judicial notice of that transcript for purposes of determining whether petitioner's sentence complies with Miller . The superintendent also asks this court to take such notice, but he further requests that this court take notice of evidence and other records that were before the sentencing court when it sentenced petitioner. We will take judicial notice of the materials requested, see Eklof v. Steward , 360 Or. 717, 722 n. 4, 385 P.3d 1074 (2016) (taking judicial notice of case registers), though we note that we will not make a habit of taking judicial notice of the kinds of additional materials submitted by the superintendent. There are several determinations that would usually take place at the trial level before materials like that could be admitted.
We are aware of only one court that has decided, after Montgomery , that Miller applies only to mandatory sentences-Jones v. Commonwealth , 293 Va. 29, 795 S.E.2d 705, cert. den. , --- U.S. ----, 138 S.Ct. 81, 199 L.Ed.2d 25 (2017). The court's statement in Jones may not have been necessary to its decision, see id. at 45, 795 S.E.2d at 714-15 (determining that principles of waiver were dispositive of the issue before the court), and the Fourth Circuit reached a contrary conclusion in a case that the United States Supreme Court is set to review. Malvo v. Mathena , 893 F.3d 265, 274 (2018), cert. granted , --- U.S. ----, 139 S.Ct. 1317, 203 L.Ed.2d 563 (2019).